**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| 6694 Dawson Blvd, LLC, Individually and on Behalf of a Class of Similarly Situated Persons, | ) ) ) | |
| | ) | CIVIL ACTION FILE |
| Plaintiff, | ) ) | NO. _____ |
| | ) | |
| vs. | ) | |
| | ) | CLASS ACTION COMPLAINT |
| Oppenheimer & Co., Inc., James Wallace Woods, Michael J. Mooney, Britt Wright, William V. Conn, Jr., Conn & Co. Tax Practice, LLC, Conn & Company Consulting, LLC, and Kathleen Lloyd, | ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |

## <u>COMPLAINT</u>

Plaintiff(s), by and through their undersigned attorneys, bring this action individually and on behalf of all other persons similarly situated, and allege as follows:

## <u>BACKGROUND TO THE DISPUTE</u>

Plaintiff and the class are victims of a massive $110,000,000 Ponzi scheme that was conceived, founded, and operated by investment advisers in Defendant Oppenheimer & Co., Inc.'s ("Oppenheimer") Atlanta, Georgia branch office located

at 3414 Peachtree Road, Atlanta, Georgia, 30326.  The architect and mastermind of the Ponzi scheme, John J. Woods ("Woods"), was an investment adviser at Oppenheimer at all times from January 2003 through December 31, 2016.  In 2008, while registered as an investment adviser at Oppenheimer, Woods founded "Horizon Private Equity, III, LLC" and began illegally marketing the unapproved "Horizon Private Equity" security to Oppenheimer's customers as well as the investing public.

Woods made no effort to hide his scheme from Oppenheimer's management -- going so far as to rent office space for his scheme next door to Oppenheimer's branch office at 3414 Peachtree Road, Atlanta, Georgia, 30326.  From 2008 through December 31, 2016, Oppenheimer's management actively aided Woods, his brother James Wallace Woods ("Jim Woods"), and his cousin Michael J. Mooney ("Mooney") (all of whom were investment advisers in Oppenheimer's Atlanta branch office) in funneling investor money into the Horizon Private Equity Ponzi scheme.  In December 2016, having full knowledge that Woods was operating a secret, illegal "private equity fund," Oppenheimer took steps to conceal the Ponzi scheme from the regulators and investing public by permitting Woods to quietly resign from Oppenheimer without reporting the wrongdoing to regulators and the investing public, as required by law.  For nearly five more years, the Horizon Private Equity Ponzi scheme, which was conceived, founded, and operated by employees in

2

Oppenheimer's Atlanta, Georgia branch office, continued raising money from unsuspecting investors through Southport Capital, a Registered Investment Advisory firm with offices across the United States.

On August 20, 2021, the Securities & Exchange Commission ("SEC") brought a civil action against Woods, Livingston Group Asset Management Co., d/b/a Southport Capital ("Southport Capital"), and Horizon Private Equity, III, LLC ("HPE III") for violations of federal securities fraud and moved for emergency relief including asset freeze, appointment of receivership, and a full accounting.  The SEC's Complaint, based on sworn affidavits from FBI agents and insiders, a review of bank statements, and interviews with investors in the Ponzi scheme, alleges that "John Woods has been running a massive Ponzi scheme for over a decade" and that "[a]s of the end of July 2021, investors in the Ponzi scheme were owed over $110,000,000 in principal."

The SEC further alleged that "many of the victims are elderly retirees who were preyed upon" by Woods and other advisers, who falsely and fraudulently represented to them that "they would receive returns of 6-7% interest, guaranteed for two to three years" and that their money would be invested in "government bonds, stocks, or small real estate projects."  In reality, the Ponzi scheme had not made any significant profits from legitimate investments and "instead a very large

percentage of purported 'returns' to earlier investors were simply paid out of new investor money." The SEC analyzed in detail Horizon Private Equity's investments and transactions from January 1, 2019 to the present and concluded that "as of the end of July 2021, Horizon had liquid assets worth less than $16 million" and "owed investors more than $110 million in principal."

Woods was not the only adviser improperly advising customers to invest in his Horizon Private Equity Ponzi scheme. Throughout the entirety of the decade-long Ponzi scheme, Woods relied on investment advisers at Southport Capital as Horizon's "sales team." Defendants Jim Woods, Mooney, and Britt Wright ("Wright") (the "Adviser Defendants"), as well as other advisers to be identified, were paid huge commissions in return for placing their customers in this unapproved, unregistered scheme. Their selling of the Horizon Private Equity Ponzi scheme violated a host of securities laws, constituted wire and mail fraud, and constituted a breach of the fiduciary duties owed to all of their customers.

The success of this decade-long Ponzi scheme also required the active participation of other third-party professionals, in addition to Oppenheimer. Woods utilized outside accountants, Defendants William V. Conn, Jr. ("Conn"), Conn & Co. Tax Practice, LLC ("Conn Tax"), Conn & Company Consulting, LLC ("Conn Consulting"), and Kathleen Lloyd ("Lloyd") (the "Accounting Defendants"), to hide

his involvement in Horizon Private Equity from the SEC. The Accounting Defendants authorized Woods to utilize their names as officers and registered agents of the various corporate entities required to operate the Horizon Private Equity Ponzi scheme. The SEC alleges that Conn's involvement in Horizon Private Equity "appears to have been a sham to avoid detection of Woods's undisclosed outside business activities..." The Accounting Defendants also assisted Woods and other Southport Capital employees with the management and operations of the Horizon Private Equity Ponzi scheme by preparing IRS Form 1099-INTs for Horizon Private Equity investors, monthly principal and interest reconciliations, monthly distribution of interest payments, and federal and state tax returns and K-1s for the Horizon Private Equity Ponzi scheme entities throughout the time period.

The allegations herein are taken from original documents in possession of Plaintiffs, as well as sworn testimony and documentation attached to and made public in filings submitted in the proceeding styled *Securities and Exchange Commission v. John J. Woods, et al.,* Case No. 1:21-cv-03413-SDG, in the United States District Court for the Northern District of Georgia.

## **PARTIES, JURISDICTION AND VENUE**

1.

Plaintiff 6694 Dawson Blvd, LLC is a Georgia limited liability company. Its

members are residents of the State of Georgia.

2.

Defendant Oppenheimer & Co., Inc., which describes itself as "a leading global full-service brokerage and investment bank," operates from a regional branch office at 3414 Peachtree Road, Atlanta, Georgia, 30326. Oppenheimer is a subsidiary of Oppenheimer Holdings, Inc., a publicly traded company listed on the New York Stock Exchange (NYSE "OPY").

3.

Defendant James Wallace Woods is a resident of Marietta, Cobb County, Georgia.

4.

Defendant Michael J. Mooney is a resident of Woodstock, Cherokee County, Georgia.

5.

Defendant Britt Wright is a resident of Pfafftown, Forsyth County, North Carolina.

6.

Defendant William V. Conn, Jr. is a resident of Sandy Springs, Fulton County, Georgia.

7.

Defendant Conn & Co. Tax Practice, LLC is a Georgia limited liability company with its principal place of business at 800 Mt. Vernon Highway, Suite 380, Atlanta, Fulton County, Georgia.

8.

Defendant Conn & Company Consulting, LLC is a Georgia limited liability company with its principal place of business at 800 Mt. Vernon Highway, Suite 380, Atlanta, Fulton County, Georgia.

9.

Defendant Kathleen Lloyd is a resident of Cumming, Forsyth County, Georgia.

10.

This Court has original jurisdiction over this class action under 28 U.S.C. § 1332(d)(2)(a), (d)(5)(b), (d)(6) because (i) members of the class of plaintiffs are citizens of States different than the Defendants; (ii) there are 100 or more class members; and (iii) there is an aggregate amount in controversy of at least $5,000,000, exclusive of interest and costs.

11.

Venue is proper in this Court because Defendants conduct business in this District and a substantial part of the events giving rise to the claim occurred in this District.

## CLASS ACTION ALLEGATIONS

12.

This action is brought and may properly proceed as a class action, pursuant to the provisions of Fed. R. Civ. P. 23.

13.

Plaintiff brings this case on behalf of a class composed of all investors in Horizon Private Equity from 2008 through present, excluding Defendants and Horizon's related parties. As to Oppenheimer, the class is composed of all investors in Horizon Private Equity from 2008 through present, excluding Defendants and Horizon's related parties, that are not subject to mandatory FINRA arbitration.

14.

This action is properly maintainable as a class action. Publicly filed records indicate that the class consists of at least 400 individuals and/or entities who invested in Horizon, minus the Defendants and related parties. Class members are so numerous that their individual joinder is impracticable. A class action is superior to

other available means for a fair and efficient adjudication of this controversy. Absent a class action, the costs and risks of litigating individual claims against Defendants would ensure that, as a practical matter, most or all class members will be unable to enforce their contractual and other rights.

15.

This action does not present difficulties in management that would preclude class treatment.   The Defendants' breaches of duties, acts constituting the procurement of breach of duties, negligence, and acts giving rise to violations of Georgia RICO are identical for all class members.  Further, there is no particularized knowledge or other elements that would require individual testimony from all of the class members.

16.

Rule 23(a)(2) and Rule 23(b)(3) are both satisfied because there are questions of law and fact which are common to the class and which predominate over questions affecting any individual class member.   The common questions include the following:

    (a)    whether the Defendants' actions procured breaches of fiduciary duty by Woods and other investment advisers involved in the sale of Horizon Private Equity investments to the class;

(b)     whether the Defendants' actions constitute negligence and/or breach of a duty to the class; and

(c)     whether the Defendants' acts give rise to liability under the Georgia RICO statute; and, if so, whether the class members have suffered injury and damages by reason of Defendants' breaches.

17.

The questions of law and fact that are common to the class, including those set forth above, predominate over any questions affecting only individual members. Plaintiff's claims and the claims of members of the Class all derive from a common nucleus of operative fact.  The common questions include the following:

(a)     whether the Defendants' actions procured breaches of fiduciary duty by Woods and other investment advisers involved in the sale of Horizon Private Equity investments to the class;

(b)     whether the Defendants' actions constitute negligence and/or breach of a duty to the class;

(c)     whether the Defendants' acts give rise to liability under the Georgia RICO statute; and, if so,

(d)     whether the class members have suffered injury and damages by reason of Defendants' breaches.

18.

The named plaintiff will fairly and adequately protect and represent the interests of the class because it has suffered injuries typical of those suffered by other class members, is committed to obtaining just relief for all class members, and has retained counsel experienced in class action litigation to represent the class.

19.

Furthermore, the prosecution of separate actions by individual members of the class would create the risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

20.

Individual litigation of the legal and factual issues raised by the conduct of Defendants would increase delay and expense to all parties and to the court system. The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale and comprehensive supervision by a single court.  Given the identical nature of class members' claims,

and the absence of material differences in the state and common laws upon which class members' claims are based, a class will be easily managed by the Court and the parties.

## THE HORIZON PRIVATE EQUITY PONZI SCHEME

21.

Plaintiff and the class members are victims of a massive $110,000,000 Ponzi scheme that was conceived, founded, and operated by investment advisers in Oppenheimer's Atlanta, Georgia branch office located at 3414 Peachtree Road, Atlanta, Georgia, 30326.

22.

The architect and mastermind of the Ponzi scheme, Woods, was registered as an investment adviser at Oppenheimer at all times from January 2003 through December 31, 2016.

23.

In 2008, while serving as an investment adviser at Oppenheimer, Woods founded "Horizon Private Equity, III, LLC" and began marketing "Horizon Private Equity" to his Oppenheimer customers and the investing public.

24.

Woods made no effort to hide his involvement in the Horizon Private Equity

Ponzi scheme from Oppenheimer's management -- going so far as to rent office space for his "selling away" scheme next door to Oppenheimer's branch office at 3414 Peachtree Road, Atlanta, Georgia, 30326.  Woods and other Horizon Private Equity fundraisers walked freely between the two offices and mingled on a daily basis with the Oppenheimer branch manager charged with supervising Woods.

25.

From 2008 through December 31, 2016, Oppenheimer's management turned a blind eye while Woods, his brother, Jim Woods, and his cousin, Mooney (all of whom were investment advisers in Oppenheimer's Atlanta branch office) funneled investor money into the Horizon Private Equity Ponzi scheme while working from Oppenheimer's Atlanta branch office.

26.

In December 2016, with full knowledge that Woods was operating a secret, illegal "private equity fund," Oppenheimer actively concealed the Ponzi scheme from the regulators and investing public by permitting Woods to quietly resign from Oppenheimer without reporting the wrongdoing to regulators and the investing public, as required by law.  Oppenheimer did so to protect itself from the substantial liability it knew it would face if it disclosed the selling away scheme.

27.

For nearly five more years, the Horizon Private Equity Ponzi scheme, which was conceived, founded, and operated by employees in Oppenheimer's Atlanta, Georgia branch office, continued raising money from unsuspecting investors.

28.

On August 20, 2021, the United States Securities & Exchange Commission ("SEC") brought a civil action against Woods, Southport Capital, and HPE III for violations of federal securities fraud and moved for emergency relief including an asset freeze, appointment of receivership, and a full accounting.

29.

The SEC's Complaint, based on sworn affidavits from FBI agents and insiders, a review of bank statements, and interviews with investors in the Ponzi scheme, alleges that "John Woods has been running a massive Ponzi scheme for over a decade" and that "[a]s of the end of July 2021, investors in the Ponzi scheme were owed over $110,000,000 in principal."

30.

The SEC further alleged that "many of the victims are elderly retirees who were preyed upon" by Woods and other advisers, who falsely and fraudulently represented to them that "they would receive returns of 6-7% interest, guaranteed

for two to three years" and that their money would be invested in "government bonds, stocks, or small real estate projects."  In reality, the Ponzi scheme had not made any significant profits from legitimate investments and "instead a very large percentage of purported 'returns' to earlier investors were simply paid out of new investor money."

31.

The SEC analyzed in detail Horizon Private Equity's investments and transactions from January 1, 2019 to the present and concluded that "as of the end of July 2021, Horizon had liquid assets worth less than $16 million" and "owed investors more than $110 million in principal."

## PLAINTIFF'S INVESTMENT IN
## THE HORIZON PRIVATE EQUITY PONZI SCHEME

32.

Plaintiff 6694 Dawson Blvd, LLC is an entity owned by Mike Hall.  On or about June 1, 2019, Mike Hall invested $200,000 in "Horizon Private Equity" through 6694 Dawson Blvd, LLC.

33.

As with all the other class members, Hall was assured by Woods that the investment was guaranteed, that he would be paid a steady rate of interest, and that he could redeem his investment at any time with notice.

## OPPENHEIMER'S INVOLVEMENT IN
## THE HORIZON PRIVATE EQUITY PONZI SCHEME

34.

Oppenheimer knew that Woods was involved in the Horizon Private Equity Ponzi scheme and took no effort to stop him.  To the contrary, Oppenheimer took active steps to conceal his wrongdoing from regulators and investors and ensured the survival of the Horizon Private Equity Ponzi scheme.

35.

Securities firms, including Oppenheimer, operate under a duty to reasonably supervise their advisers so as to, among other things, (1) prevent and detect "selling away schemes" (i.e., the sale of securities not approved for sale by the firm); (2) prevent and detect the use of unapproved and unmonitored email accounts; (3) detect and supervise any undisclosed outside business activities in which its advisers are involved; (4) detect and prevent their advisers from committing fraud; (5) supervise and monitor transfers of investor money to third parties; and (6) truthfully and accurately report the reasons for any termination or resignation of its advisers on FINRA Form U5.

36.

Oppenheimer is required to devote substantial resources dedicated to compliance and supervisory systems and personnel, whose job is to identify potential

red flags and respond to them, based on their review of public databases, regular audits, reviews of all correspondence including their employees' emails.

37.

Oppenheimer facilitated the Horizon Private Equity Ponzi scheme by taking the following actions and/or failing to take the following actions described below:

- From 2008-December 2016, Oppenheimer failed to review and identify various outside business activities which were easily discoverable from a review of Georgia corporations which can be searched on the Secretary of State's website.  For instance, Woods incorporated Horizon Private Equity, LLC as a Georgia entity on September 20, 2007.  The initial filing lists Woods as the company's initial Registered Agent.  Woods was identified as the company's Registered Agent in the company's 2007 and 2008 annual registrations.

- On or about September 2008, the Probascos family sold Southport Capital. Woods was quoted in an article that ran in the "Chattanoogan.com" on September 28, 2008 entitled "*John Woods Acquires Southport Capital from Probascos*."   The article, which ran while Woods was a broker at Oppenheimer, read "John Woods, businessman, philanthropist and children's sports development enthusiast, has acquired Southport Capital" from the Probascos family.  The article noted that "Jim Woods, brother of John Woods, will be the chief investment strategist for Southport Capital."  There is no indication that Oppenheimer took any steps to supervise the activities of Southport Capital, an investment advisory they knew to be owned by one of their own advisers.

- In or around 2007, Oppenheimer became aware that investors had accused Woods of fraud in connection with undisclosed outside business activities -- while he was registered as an investment adviser at Oppenheimer.  The lawsuit detailed not only that Woods ran a web of outside businesses but that he was heavily indebted in connection with the failed ventures -- a huge red flag for an investment adviser charged with safeguarding investor money.  The publicly available lawsuit, styled *Lisa and Harry Walsh v. John Woods, Sports*

*Science CH, Inc., Honeycutt Sports LLC, Sports Science Cool Springs, LLC and E Sports LLC*, Case No. 2007-cv-135987, Superior Court of Fulton County, Georgia, referenced Woods' web of companies in the fitness industry as well as the existence of a $6,000,000 loan "personal to John Woods" used to purchase one of the companies.  The allegations against Woods included, for instance, "that Defendant Woods promised them a 12% return on their investment, overstated the financials of the companies before they invested, and misrepresented the financials of Honeycutt" and moved investor money into his personal bank accounts.

- In March 2015, another lawsuit, styled *Kenneth Himmler v. Livingston Group Asset Management, Inc. d/b/a Southport Capital, Inc., Horizon Private Equity, LLC, James Wallace Woods, John J. Woods, Michael Mooney, and John Does 1 through 10*, Case No. 15-cv-00497, In the United States District Court for the District of Nevada, was filed against Woods while Woods was still working as an investment adviser in Oppenheimer's Atlanta branch office.  The *Himmler* lawsuit expressly detailed Woods' personal involvement in the Horizon Private Equity Ponzi scheme.  The lawsuit, in which Horizon Private Equity and Woods were named, alleged among other things, that: "Plaintiff is informed and believes that "HPE [Horizon Private Equity]" has a controlling interest in Southport"; "Plaintiff is informed and believes that [Michael] Mooney [who worked at Southport then and now] is Chairman of the Board of Directors for Horizon Private Equity"; "Plaintiff is informed and believes that Jim Woods, John Woods, and Michael Mooney control both Southport and HPE and used them as their alter egos or mere instrumentalities"; that in early 2014, Plaintiff entered into negotiations with Woods and Mooney resulting in the sale of his financial planning practice to Horizon Private Equity; and that he sold his financial planning practice to Horizon Private Equity.

Emails attached to the Complaint, which were publicly available at the time, show communications between Woods and the plaintiff discussing the terms of this deal whereby Horizon Private Equity would purchase his financial planning book of business on behalf of Southport Capital.  Woods, who was registered with Oppenheimer at the time, was utilizing a private email address "johnwoods@mindspring.com" for these communications.  Oppenheimer would have detected and stopped the fraud in 2015 had they taken steps to

review the private email account used by Woods publicly identified in the *Himmler* lawsuit.

- Woods leased the office space on the same floor directly adjacent to Oppenheimer's Atlanta branch office in the Monarch Plaza tower for Southport Capital's Atlanta branch office through which he and others sold interests in Horizon Private Equity. This allowed Woods to physically move between Oppenheimer and his selling away scheme during Oppenheimer business hours. There does not appear to have been any attempt to hide this fact. During the time period that they shared offices, the doors to the left had Oppenheimer's name and logo on the door. The doors to the right had the Southport Capital name and its familiar lighthouse logo on the door.

  During trading hours while registered at Oppenheimer, Woods would frequently walk back and forth between the Oppenheimer and Southport Capital offices. This practice, which took place for several years before Southport Capital moved its office, was well known to all employees in the office, including the Oppenheimer Atlanta branch manager at the time, William Atkinson Lobb, II (CRD #848408).

  Jim Woods wasn't the only Oppenheimer broker to move "next door" to Horizon/Southport Capital. In 2010, Mooney, who is related to Woods and Jim Woods and worked with the Woods at Oppenheimer, left Oppenheimer to join Southport Capital. Mooney is still registered as an Investment Advisor Representative at Southport Capital. His Form ADV states that he "served as a third-party solicitor for the Horizon Private Equity funds from 2009 through the end of 2016."

- Woods made investor presentations in the Oppenheimer Atlanta branch office to investors using presentations on Oppenheimer letterhead to convey the impression that the Horizon Private Equity Ponzi scheme was an investment offered through Oppenheimer.

- From 2008-present, Oppenheimer facilitated the transfer of millions of dollars in customer funds to Horizon Private Equity. Oppenheimer completely failed in its duty to monitor and supervise liquidations of client investments and subsequent transfers to Horizon Private Equity.

- On or about December 2016, after learning about Woods' involvement in various undisclosed business activities, including the Horizon Private Equity Ponzi scheme, Oppenheimer permitted Woods to resign from their firm. Even so, Oppenheimer had a duty to complete the Form U5 and notify FINRA and the investing public that he had been permitted to resign after they detected his involvement in wrongdoing. Instead, Oppenheimer intentionally hid the fact that they had detected the wrongdoing. From 2017-present, Oppenheimer failed to amend the Form U5 to accurately state the reasons for his resignation. From 2017-present, Woods' public "Investment Adviser Public Disclosure" made it appear to the investing public that Woods resigned from Oppenheimer on good terms and that Oppenheimer had not discovered any wrongdoing prior to his resignation.

38.

From 2008-2014, when this scheme was in place, Oppenheimer's President was Robert Okin.

39.

Robert Okin was the Head of Oppenheimer's "Private Client Division" during this relevant time period and was responsible for supervising Oppenheimer's advisers.

40.

Okin was barred from the securities industry by the SEC for failing to supervise other Oppenheimer brokers who were perpetrating fraud on other Oppenheimer customers in connection with the sale of 2.5 billion penny stock shares in illegal unregistered transactions. Oppenheimer's actions in this case resulted from

its well-documented and cited failure to supervise its advisers during this time period.

### THE ADVISER DEFENDANTS' INVOLVEMENT IN THE HORIZON PRIVATE EQUITY PONZI SCHEME

41.

The success of Woods' Ponzi scheme also relied from the outset in 2008 all the way through the present to the active involvement of the Adviser Defendants.

42.

Each of the Adviser Defendants were, at all times, registered as Investment Adviser Representatives with the SEC.

43.

From 2008-present, each of the Adviser Defendants marketed and sold the Horizon Private Equity Ponzi scheme to their securities customers.

44.

The Adviser Defendants knew that the Horizon Private Equity security was not registered with the SEC.

45.

The Adviser Defendants took active steps to conceal their involvement in the Horizon Private Equity Ponzi scheme by failing to disclose their sale of the security as an outside business activity to the SEC.

## THE ACCOUNTING DEFENDANTS' INVOLVEMENT IN
## THE HORIZON PRIVATE EQUITY PONZI SCHEME

46.

The success of Woods' Ponzi scheme also relied from the outset in 2008 all the way through the present to the active involvement of the Accounting Defendants.

47.

The Accounting Defendants authorized and/or directed that various entities related to the Horizon Private Equity Ponzi scheme be placed in their names so as to hide Woods' involvement.  Woods incorporated Horizon Private Equity, LLC as a Georgia entity on September 20, 2007.  The initial filing lists Woods as the company's initial Registered Agent.  Woods was identified as the company's Registered Agent in the company's 2007 and 2008 annual registrations.  In 2009, Woods' name disappeared from the corporate filings, replaced by Lloyd.  In 2014, Conn was named the Registered Agent and has thus appeared on the company's annual registrations from 2014-2020.

48.

Woods incorporated HPE III -- the second "Horizon Private Equity" entity -- on October 22, 2007, by changing the name of another entity he controlled, VSpeed, LLC.  The company's first Annual Registration listed Woods and his accountant, Lloyd, as the Company's Registered Agents.  Woods' name disappeared from the

company's filings thereafter.  From 2009 to 2021, the company has listed either Woods' accountants, Lloyd and Conn, or his attorney, Mary Galardi, as the company's Registered Agent.

49.

On January 29, 2008, a single SEC Form D was filed by issuer Horizon Private Equity, LLC for the sale of up to $3,000,000 in membership units.  The Form D was signed by Conn, listing him as "President" of Horizon Private Equity, LLC.  The Form D required the filers to identify each promoter of the issuer, each beneficial owner, each executive officer and director, and each general and managing partner of Horizon Private Equity, LLC.  Conn and Lloyd were listed as Horizon's "Executive Officers."  This document was publicly available and easily detected from an internet search of "Horizon Private Equity."

50.

The Accounting Defendants provided ongoing services to Woods and/or Horizon Private Equity on a regular basis from 2008 to the present.  A Horizon Private Equity Private Placement Memorandum ("PPM") filed in the SEC case identified Conn as being Horizon's President/CEO and Lloyd as being Horizon's Secretary and Treasurer.  It further disclosed that "Kathleen Lloyd, who will be acting as Secretary and Treasurer for the Company, is employed by John Woods, the

Advisor to the Company," and that Conn would be making all investment decisions for Horizon and would be "entitled to 10% of any cash distributions of the Company." The PPM states that Lloyd would be compensated for her services pursuant to a "management agreement."

51.

In a lawsuit filed against Woods during the relevant time period, Lloyd submitted a sworn affidavit in which she identified herself as a consultant providing "human resources and accounting services" to various companies controlled by Woods.

52.

The Accounting Defendants also assisted Woods and other Southport Capital employees with the management and operations of the Horizon Private Equity Ponzi scheme by preparing IRS Form 1099-INTs for Horizon Private Equity investors, monthly principal and interest reconciliations, monthly distribution of interest payments, and federal and state tax returns and K-1s for the Horizon Private Equity Ponzi scheme entities throughout the time-period.

## COUNT I
## GEORGIA RICO
## (All Defendants)

53.

Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

54.

This claim for relief arises under O.C.G.A. § 16-14-6 of the Georgia RICO Act and seeks relief from Defendants' activities described herein for violations of O.C.G.A. § 16-14-4 (a), (b).   Plaintiff further seeks relief from Defendants' conspiring to violate O.C.G.A. § 16-14-4 (a), (b), pursuant to subsection (c) thereof.

55.

Defendants violated O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in or control of an enterprise and personal property, including money, through a pattern of racketeering activity.

56.

Defendants violated O.C.G.A. § 16-14-4(b) by participating in the affairs of an enterprise through a pattern of racketeering activity.

57.

Defendants violated O.C.G.A. § 16-14-4(c) by conspiring to violate O.C.G.A. § 16-14-4(a) and O.C.G.A. § 16-14-4 (b).   As part of that conspiracy, Defendants agreed to a common unlawful endeavor and committed overt acts, including but not limited to acts of racketeering activity, in furtherance of their conspiracy.   The investors were injured by reason of their conspiracy.

## The Enterprise

58.

The Defendants, along with non-parties Woods, Southport Capital, and HPE III were individuals whose association in fact to obtain investor money for the HPE III Ponzi scheme constituted an "enterprise" as defined in O.C.G.A. § 16-14-3(3).

59.

The enterprise was an ongoing association whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise. The enterprise engaged in activities primarily in and around Atlanta, Georgia.

60.

The principal purpose of the enterprise was to enrich Woods and provide Woods with money for various business purposes, as well as to repay regular interest payments owed to earlier investors in the Ponzi scheme.   The enterprise was also

designed to avoid detection by regulators and investors so as to keep the enterprise going and/or avoid liability to the investors.  The members of the enterprise carried out this purpose by using a variety of methods and means, some of which were legal. Others were illegal or were performed in an illegal fashion.  These illegal actions included but are not limited to racketeering activity as defined in O.C.G.A. § 16-14-3(5)(A), O.C.G.A. § 16-14-3(5)(B), and O.C.G.A. § 16-14-3(5)(C), and overt acts in furtherance of the conspiracy to violate O.C.G.A. § 16-14-4(a) and O.C.G.A. § 16-14-4(b).

61.

The activities of the enterprise included but were not limited to: marketing and selling interests in HPE III, liquidating and/or selling existing assets to fund investments in the Horizon Private Equity Ponzi scheme, transferring by mail and wire money to fund investments in Horizon Private Equity Ponzi scheme, filing false and misleading reports to securities regulators to hide the existence of the Horizon Private Equity Ponzi scheme, using mail and wire to transmit investor statements, and using individuals as "fronts" to hide the members' involvement in the Horizon Private Equity Ponzi scheme.

62.

The enterprise had differentiation of roles and regular communications.  The members shared common concerns and objectives which were primarily financial in nature.  The enterprise had stability of personnel.

## The Predicate Acts

63.

All of the Defendants, along with Woods, Southport Capital, and HPE III, engaged in a pattern of racketeering activity as defined in O.C.G.A. § 16-14-4(a), O.C.G.A. § 16-14-4(b), and O.C.G.A. § 16-14-4(c) by performing at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents, and the last of such acts occurred within four years, excluding any periods of imprisonment, after the commission of a prior act of racketeering activity.

64.

These acts of racketeering activity included, but were not necessarily limited to, the following indictable offenses enumerated in O.C.G.A. § 16-14-3:

- Securities fraud in violation of the "Georgia Securities Act of 2008." Woods, Jim Woods, Mooney, Wright, Southport Capital, and HPE III committed securities fraud by employing, directly or indirectly, a device, scheme, or artifice to defraud, or making an untrue statement of material fact in connection with selling or offering to sell securities, in violation of O.C.G.A. § 10-5-50(a)-(b), by causing the sale of securities to investors based on material falsehoods and omissions regarding the nature of the investment, use of proceeds and investment returns. A violation of the Georgia Securities Act is a predicate act under O.C.G.A. § 16-14-3(5)(A)(iii).

- Securities fraud in violation of the "Georgia Securities Act of 2008." Woods, Jim Woods, Mooney, Wright, Southport Capital, and HPE III also committed securities fraud by engaging in an act, practice, or course of business operating as a fraud or deceit upon another person in violation of O.C.G.A. § 10-5-50(c), by causing the sale of securities to investors based on material falsehoods and omissions regarding the nature of the investment, use of proceeds and investment returns. A violation of the Georgia Securities Act is a predicate act under O.C.G.A. § 16-14-3(5)(A)(iii).

- Securities fraud in violation of the "Georgia Securities Act of 2008." Woods, Jim Woods, Mooney, Wright, Southport Capital, and HPE III also committed securities fraud by engaging as an investment advisor in employing a device, scheme, or artifice to defraud another person and engaging in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person in violation of O.C.G.A. §10-5-51, by causing the sale of securities to investors based on material falsehoods and omissions regarding the nature of the investment, use of proceeds and investment returns. A violation of the Georgia Securities Act is a predicate act under O.C.G.A. § 16-14-3(5)(A)(iii).

- Securities fraud in violation of the "Georgia Securities Act of 2008." Woods, Jim Woods, Mooney, Wright, Southport Capital, and HPE III also committed securities fraud by employing and/or associating with an individual required to be registered under this chapter as an investment adviser representative on behalf of the investment adviser in violation of O.C.G.A. § 10-5-32 and O.C.G.A. § 10-5-33, by permitting Woods to act as an investment adviser representative of Southport Capital from January 2017 through January 2,

2019.  A violation of the Georgia Securities Act is a predicate act under O.C.G.A. § 16-14-3(5)(A)(iii).

- Theft in violation of Article 1 of Chapter 8 of Title 16 of the Georgia Code. Woods, Jim Woods, Mooney, Wright, Southport Capital, and HPE III committed, at a minimum, theft by deception in violation of O.C.G.A. § 16-8-3 by misappropriating and stealing funds invested in HPE III for their personal uses and transferring new investor money to pay interest owed to existing investors without the knowledge or consent of the investors.  Theft is a predicate act under O.C.G.A. § 16-14-3(5)(A)(xii).

- Mail fraud in violation of 18 U.S.C. § 1341.  Woods, Jim Woods, Mooney, Wright, Southport Capital, HPE III, and the Accounting Defendants committed mail fraud by causing security investment account statements, federal tax filings, and other documents to be sent in the mail to third party custodians and taxing authorities all for the purpose of furthering their fraudulent scheme to misappropriate investor funds.  Mail fraud is a predicate act under O.C.G.A. § 16-14-3(5)(C); 18 U.S.C. 1961(1).

- Wire fraud in violation of 18 U.S.C. § 1343.  Woods, Jim Woods, Mooney, Wright, Southport Capital, HPE III, and the Accounting Defendants committed wire fraud by making use of telephone calls and other electronic communications, including email, in furtherance of their fraudulent Ponzi scheme.  Wire fraud is a predicate act under O.C.G.A. § 16-14-3(5)(C); 18 U.S.C. 1961(1).

- Theft or embezzlement from employee business plan in violation of 18 U.S.C. § 664.  Woods, Jim Woods, Mooney, Wright, Southport Capital, and HPE III committed theft or embezzlement from employee business plans by misappropriating and stealing Individual Retirement Account ("IRA") funds invested in HPE III for their personal uses and transferring new investor money to pay interest owed to existing investors without the knowledge or consent of the investors.  Theft or embezzlement from employee business plan is a predicate act under O.C.G.A. § 16-14-3(5)(C); 18 U.S.C. § 1961(1).

- Engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957.  Woods, Jim Woods, Mooney, Wright, Southport Capital, and HPE III engaged in numerous

monetary transactions with banks and securities firms using property criminally derived from the Horizon Private Equity investors. Engaging in monetary transactions in property derived from specified unlawful activity is a predicate act under O.C.G.A. § 16-14-3(5)(C); 18 U.S.C. § 1961(1).

- Mail fraud in violation of 18 U.S.C. § 1341. Oppenheimer committed mail fraud by causing security investment account statements, federal tax filings, and other documents to be sent in the mail to third party custodians and taxing authorities all for the purpose of furthering their fraudulent scheme to misappropriate investor funds. Mail fraud is a predicate act under O.C.G.A. § 16-14-3(5)(C); 18 U.S.C. 1961(1).

- Wire fraud in violation of 18 U.S.C. § 1343. Oppenheimer committed wire fraud by making use of telephone calls and other electronic communications, including email, in furtherance of the fraudulent Ponzi scheme. Wire fraud is a predicate act under O.C.G.A. § 16-14-3(5)(C); 18 U.S.C. 1961(1).

- Engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957. Oppenheimer engaged in numerous monetary transactions with banks and securities firms using property criminally derived from the Horizon Private Equity investors. Engaging in monetary transactions in property derived from specified unlawful activity is a predicate act under O.C.G.A. § 16-14-3(5)(C); 18 U.S.C. § 1961(1).

- Securities fraud in violation of the "Georgia Securities Act of 2008." The Accounting Defendants committed securities fraud by engaging in an act, practice, or course of business operating as a fraud or deceit upon another person in violation of O.C.G.A. § 10-5-50(c), by using their names to hide the true identity of the promoters of Horizon from the SEC and investors, preparing tax and accounting documents and customer statements necessary to support the scheme. A violation of the Georgia Securities Act is a predicate act under O.C.G.A. § 16-14-3(5)(A)(iii).

- Securities fraud in violation of the "Georgia Securities Act of 2008." The Accounting Defendants also committed securities fraud by engaging as an investment advisor in employing a device, scheme, or artifice to defraud another person and engaging in an act, practice, or course of business that

operates or would operate as a fraud or deceit upon another person in violation of O.C.G.A. §10-5-51, by using their names to hide the true identity of the promoters of Horizon from the SEC and investors, preparing tax and accounting documents and customer statements necessary to support the scheme.. A violation of the Georgia Securities Act is a predicate act under O.C.G.A. § 16-14-3(5)(A)(iii).

- Mail fraud in violation of 18 U.S.C. § 1341. The Accounting Defendants committed mail fraud by causing security investment account statements, federal tax filings, and other documents to be sent in the mail to third party Custodians and taxing authorities all for the purpose of furthering their fraudulent scheme to misappropriate investor funds. Mail fraud is a predicate act under O.C.G.A. § 16-14-3(5)(C); 18 U.S.C. 1961(1).

- Wire fraud in violation of 18 U.S.C. § 1343. The Accounting Defendants committed wire fraud by making use of telephone calls and other electronic communications, including email, in furtherance of the fraudulent Ponzi scheme. Wire fraud is a predicate act under O.C.G.A. § 16-14-3(5)(C); 18 U.S.C. 1961(1).

- Engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957. The Accounting Defendants engaged in numerous monetary transactions with banks and securities firms using property criminally derived from the Horizon Private Equity investors. Engaging in monetary transactions in property derived from specified unlawful activity is a predicate act under O.C.G.A. § 16-14-3(5)(C); 18 U.S.C. § 1961(1).

### Conspiracy to Commit the Violations of Woods, Jim Woods, Mooney, Southport Capital, and HPE III

65.

The object and purpose of the conspiracy included facilitating the commission of acts of racketeering activity by its members and committing acts of racketeering to conceal those that had already occurred.

66.

The Defendants, along with Woods, Southport Capital, and HPE III, were aware of and agreed to the general criminal objectives of their jointly undertaken scheme.  They knowingly and willfully joined in a conspiracy which itself contained a common plan or purpose to commit two or more predicate acts.

67.

The purposes of the conspiracy were not accomplished, nor was the conspiracy abandoned, more than five years prior to the filing of the Complaint.

68.

The Defendants, Woods, Southport Capital, and HPE III undertook a number of overt acts in furtherance of the conspiracy, including, but not limited to: marketing and selling interests in HPE III, liquidating and/or selling existing assets to fund investments in the Horizon Private Equity Ponzi scheme, transferring by mail and wire money to fund investments in Horizon Private Equity Ponzi scheme, filing false and misleading reports to securities regulators to hide the existence of the Horizon Private Equity Ponzi scheme, using mail and wire to transmit investor statements, and using individuals as "fronts" to hide the members' involvement in the Horizon Private Equity Ponzi scheme.

69.

The Defendants' illegal agreements and overt acts in furtherance of this conspiracy are in violation of O.C.G.A. § 16-14-4(c).

### Liability of Oppenheimer for the Violations of Woods, Jim Woods, Mooney, Southport Capital, and HPE III

70.

At all times prior to January 2017, Woods was an agent of Oppenheimer by virtue of his employment as an Executive Director and investment adviser for Oppenheimer.

71.

From 2008 through January 2017, Woods raised money for and operated the Horizon Private Equity Ponzi scheme from Oppenheimer's Atlanta, Georgia branch office.

72.

Oppenheimer's Atlanta branch manager during the relevant time period, William Atkinson Lobb, II, was physically located down the hall from Woods and was charged by law with supervising his activities to ensure Woods was complying with all securities laws.  Lobb and other Oppenheimer management had first-hand, actual knowledge of Woods' activities from a multitude of sources including public

filings and the allegations set forth in the *Himmler* lawsuit, which attached emails from Woods' undisclosed personal email account.

73.

In addition to Lobb, a host of other Oppenheimer personnel were, or should have been, aware of the selling away scheme, including the on-site compliance manager physically present in the Atlanta branch office.

74.

Oppenheimer is vicariously liable for the criminal acts undertaken by Woods from 2008-present because Oppenheimer's executives, managers, and compliance personnel authorized and/or recklessly tolerated Woods' acts.

## COUNT II
## Breach of Fiduciary Duty
## (Adviser Defendants)

75.

Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

76.

As registered investment advisor representatives with Southport Capital, the Adviser Defendants owed all Southport Capital customers, including Plaintiff and the class, fiduciary duties with respect to management of their investments.

77.

The Adviser Defendants breached their fiduciary duties to Plaintiff and the class by, among other things, (1) participating in the sale of an unregistered security; (2) engaging in an act, practice, or course of business operating as a fraud or deceit upon another person in violation of O.C.G.A. § 10-5-50(c); and (3) by causing the sale of securities to investors based on material falsehoods and omissions regarding the nature of the investment, use of proceeds and investment returns.

78.

As a proximate cause of these actions, Plaintiff and the class have sustained damages in an amount to be proven at trial.

79.

The breaches set forth herein took place on a regular and ongoing basis at all times from 2008 through the present.

## COUNT III
## CONSPIRACY AND/OR PROCUREMENT OF BREACH OF FIDUCIARY DUTY
### (Defendant Oppenheimer and the Accounting Defendants)

80.

Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

81.

Oppenheimer is a sophisticated financial institution with access to world-class legal and management experience and assistance. Oppenheimer was aware of the fiduciary duty owed to Woods' customers and yet it purposefully hid Woods' and the Adviser Defendants' violations of securities related statutes by permitting them to quietly resign from Oppenheimer and failing to comply with SEC and FINRA rules requiring Oppenheimer to disclose said violations at the time Woods and the Adviser Defendants were permitted to resign from Oppenheimer.

82.

Similarly, the Accounting Defendants were involved in HPE III from its inception and were aware that Woods and other investment advisers were marketing and selling HPE III to investors in violation of their fiduciary duties to their customers.

83.

As a result of their actions, Oppenheimer and the Accounting Defendants procured the breach of fiduciary duty committed by Woods, Southport Capital, and Southport Capital's other investment adviser representatives that marketed and sold interests in the Horizon Private Equity Ponzi scheme.

84.

Each of the breaches were undertaken willfully and in reckless disregard of their obligations and duties to the investors.

85.

As a result of their actions, Oppenheimer and the Accounting Defendants procured the breach of fiduciary duty committed by Woods and the Adviser Defendants.

86.

As a result of its actions, Oppenheimer and the Accounting Defendants proximately caused damages to Plaintiff and the class in an amount to be determined at trial.

## COUNT IV
## Negligent Misrepresentation
## (Oppenheimer)

87.

Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

88.

Oppenheimer was required by law to file a "Form U5 Uniform Termination Notice for Securities Industry Registration" with securities regulators.  Oppenheimer

was required to file the Form U5 as to Woods within thirty (30) days of his employment end date.  In the Form U5, Oppenheimer was required to disclose why an individual left the firm.

89.

Oppenheimer was under a continuing obligation to amend and update Woods' Form U5 to include reportable matters that became known to Oppenheimer after initial submission of the Form U5.

90.

Oppenheimer was required to disclose whether Woods was "under internal review for fraud or wrongful taking of property, or violating investment-related statutes, regulations, rules or industry standards of conduct."   Separately, Oppenheimer was asked whether Woods voluntarily resigned, or was permitted to resign, after allegations were made that he had violated "investment-related statutes, regulations, rules or industry standards of conduct?"

91.

Oppenheimer had actual knowledge that Woods was engaged in a selling away scheme in violation of "investment-related statutes, regulations, rules or industry standards of conduct," but permitted Woods to resign without disclosing the wrongdoing on the Form U5.  Had they done so, the violation would have

automatically triggered an investigation by FINRA and would have been placed on

Woods' publicly available "broker check."

92.

From January 2017 through the present, Oppenheimer, which had actual

knowledge of the wrongdoing, failed to comply with its duty to amend and update

Woods' Form U5, which would have publicly disclosed the wrongdoing to

regulators and the public.

93.

From January 2017 through the present, Southport Capital was required by

law to provide all customers the SEC Form ADV which includes, among other

things, disclosures regarding the advisors employed at Southport Capital.  Had

Oppenheimer completed the Form U5 truthfully, its disclosure would have been

included on the Form ADV provided to Plaintiff and the class.  Instead, the Form

ADV provided to Southport Capital customers, including Plaintiff and the class,

indicated that Woods had left Oppenheimer on good terms.

94.

Oppenheimer failed to exercise reasonable care and competence in the

representations made to regulators and the investing public, including Plaintiff and

the class.

95.

Oppenheimer owed Plaintiff and the class a duty of reasonable care and competence in the provision of information to FINRA that was relied upon by Plaintiff and the class deciding to invest in the Horizon Private Equity Ponzi scheme.

96.

Oppenheimer breached this duty by failing to exercise reasonable care and diligence and providing information with respect to Woods' resignation that was false, inaccurate, and/or misleading.

97.

Plaintiff and the class, at the time these representations were made, and at the time they took the actions alleged herein, were unaware of the falsity, inaccuracy and/or misleading nature of Oppenheimer's representations.  Plaintiff and the class's reliance on the statements was justifiable and reasonable given Oppenheimer's reputation and superior knowledge.

98.

In reliance on these representations, Plaintiff and the class were induced to incur, and did incur, damages.

99.

Oppenheimer had the ability at all times to correct their false filing but chose

not to do so, thus giving the appearance to the investing public at all times from 2016-present that Woods resigned from its firm whilst in good standing.  Thus, the negligent misrepresentations were publicly stated and reiterated on a regular and ongoing basis at all times from December 2016 to the present.

100.

As a proximate result of Oppenheimer's negligent misrepresentations as herein alleged, Plaintiff and the class have incurred damages.

**COUNT V**
**Aiding and Abetting Fraud**
**(All Defendants)**

101.

Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

102.

Oppenheimer knew or should have known that fraud and wrongful acts and omissions like that committed by Woods and his related parties was possible absent appropriate monitoring, supervision, rules, and safeguards but purposefully failed to engage in monitoring or supervising or to adopt such rules or safeguards.

103.

Oppenheimer, after discovering the Ponzi scheme, intentionally filed false statements with regulators so as to shield Woods from being discovered because it knew that it was liable for him engaging in a Ponzi scheme from their office and they wished to avoid financial liability for his acts.

104.

Oppenheimer thereby substantially assisted in the fraud by deliberately turning a blind eye to illegal conduct and/or intentionally covering up the illegal conduct.

105.

The conduct of Oppenheimer directly and proximately caused damages to all investors who invested in the Horizon Private Equity Ponzi scheme from 2008 to present.

106.

Likewise, the Accounting Defendants knew or should have known that fraud and wrongful acts and omissions were being committed by Woods and his related parties due to their access to financial records, legal documents and active participation in his web of related corporate entities Woods utilized to carry out his illegal scheme.

107.

The Accounting Defendants failed to take any action to notify investors or regulators that Woods was engaged in an illegal Ponzi scheme.

108.

The Accounting Defendants thereby substantially assisted in the fraud by deliberately turning a blind eye to illegal conduct and/or intentionally covering up the illegal conduct.

109.

The conduct of the Accounting Defendants directly and proximately caused damages to all investors who invested in the Horizon Private Equity Ponzi scheme from 2008 to present.

**COUNT VI**
**UNJUST ENRICHMENT**
**(The Adviser and Accounting Defendants)**

110.

Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

111.

As a result of the various breaches alleged herein, Plaintiff and the class suffered damages.  The Adviser and Accounting Defendants were unjustly enriched

by the receipt of ongoing fees from Horizon investor money for which they were not entitled due to the acts set forth herein.

### 112.

The Adviser and Accounting Defendants should in all interests of fairness be required to disgorge all compensation earned and monies taken from Horizon Private Equity from its inception through the present.

### COUNT VII
### PUNITIVE DAMAGES
### (All Defendants)

### 113.

Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

### 114.

Defendants engaged in willful misconduct, acted with malice, and have engaged in fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

### 115.

Defendants acted with specific intent to cause harm to the investors.

### 116.

In light of the allegations set forth herein, Plaintiff and the class are entitled

to punitive damages.

## COUNT VIII
## ATTORNEYS' FEES
### (All Defendants)

### 117.

Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

### 118.

Defendants have acted in bad faith, have been stubbornly litigious and have caused Plaintiffs unnecessary trouble and expense.

### 119.

Pursuant to O.C.G.A. § 9-5-14 and Titles 10 and 16 of the Georgia Code, Plaintiffs are entitled to recover from Defendants their expenses of litigation, including but not limited to, attorneys' fees.

## PRAYER FOR RELIEF

Plaintiff respectfully asks that this Court:

(a)    Enter an order certifying this action as a class action pursuant to Fed. R. Civ. P. 23;

(b)    Conduct a jury trial of all claims and issues as to which there is a right to jury trial;

(c)     Enter judgment awarding damages to Plaintiff and the class in an

amount to be determined at trial;

(d)     Award Plaintiff the costs of this suit, including reasonable attorneys'

fees; and

(e)     Such other and further relief as the Court deems proper and just.

Plaintiff hereby demands a trial by jury.

Respectfully submitted this 31st day of August, 2021.

**THE LAW OFFICE OF CRAIG KUGLAR, LLC**

 /s/ Craig H. Kuglar
CRAIG H. KUGLAR, ESQ.
Georgia Bar No. 429968

The Law Office of Craig Kuglar, LLC
931 Monroe Drive NE, Suite A102-353
Atlanta, Georgia  30308
TEL (404) 432-4448
FAX (404) 393-8007
ck@kuglarlaw.com

**CHAPMAN ALBIN LLC**

JOHN S. CHAPMAN, ESQ.
***Pro hac vice application forthcoming***
jchapman@chapmanlegal.com
JASON T. ALBIN, ESQ.
***Pro hac vice application forthcoming***
jalbin@chapmanlegal.com
PHILIP L. VUJANOV, ESQ.
***Pro hac vice application forthcoming***
pvujanov@chapmanlegal.com
Chapman Albin LLC
700 West St. Clair Avenue
Suite 200
Cleveland, Ohio  44113
TEL (216) 241-8172
FAX (216) 241-8175

*Attorneys for Plaintiffs*

## <u>LOCAL RULE 7.1D CERTIFICATION</u>

This is to certify that the foregoing pleading complies with the font and margin specifications set forth in Local Rule 5.1B.  The font used is Times New Roman, 14 point.

/s/ Craig H. Kuglar